## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | 8:10CR283 |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | FINDINGS AND |
| | ) | |
| DARROW FOWLER, | ) | RECOMMENDATION |
| | ) | |
| Defendant. | ) | |

This matter is before the court on the motion to suppress filed by defendant Darrow Fowler (Fowler) (Filing No. 16). Fowler is charged in the Indictment with the knowing possession of a firearm after having been convicted of a felony in violation of 18 U.S.C. § 922(g). Fowler seeks to suppress all evidence obtained as a result of contact with officers of the Omaha Police Department (OPD) on April 29, 2010, in the vicinity of 16th and Laird Streets in Omaha, Nebraska.

Evidentiary hearings were held on Fowler's motion on October 20, 2010, and October 28, 2010. Fowler was present for the hearings along with his counsel, James C. Webering. The United States was represented by Assistant U.S. Attorney Sandra L. Denton. During the hearing, the court heard the testimony of OPD Officers Brett Becker (Officer Becker) and Ryan Sedlacek (Officer Sedlacek), Kenneth Walker (Mr. Walker), Barbara Robinson (Ms. Robinson), and Dennise Marie Allen (Ms. Allen). The court received into evidence the following exhibits:  Exhibit 1 - OPD Rights Advisory Form; Exhibit 101 - Google map of 16th and Laird Streets; Exhibit 102  - photo of corner of 16th and Laird Streets; Exhibit 103 - photo of arrest site; Exhibit 104 - photo of northwest side of 16th and Laird Streets; Exhibit 105 - photo of driveway; Exhibit 107 - photo of area between 1615 and 1611 Laird Street; Exhibit 108  - photo of wooden fence with lattice on top; Exhibit 106  - photo of southwest portion of 1615 Laird Street; Exhibit 109 - photo of gate opening; Exhibit 110 - OPD incident report; and Exhibit 111 - criminal history of Darrow Fowler.  A transcript (TR.) of the hearing was prepared and filed on November 8, 2010 (Filing No. 32).

**FINDINGS OF FACT**

On April 29, 2010, Officer Becker, an officer with the OPD North Gang Suppression Squad, was on patrol in North Omaha with Officer Sedlacek (TR. 24).  Both officers had in excess of four years experience in the gang suppression unit (TR. 22; 97).  Officer Sedlacek was driving a 2003 Dodge Intrepid OPD patrol vehicle, black in color with the words "Omaha Police" on the side (TR. 104).  Officer Becker was in the front passenger seat of the patrol vehicle (TR. 24).  Officers Becker and Sedlacek were focusing on the area of 16th and Laird Streets because of numerous bulletins concerning gang activity in that area involving narcotics and firearms (TR. 24).  Around 6 p.m. Officers Becker and Sedlacek headed toward 16th and Laird to determine if there were any gang members loitering in the area (TR. 24).  As the officers turned the corner at 16th and Laird, they observed Fowler and others in front of 1611 Laird and observed Fowler walk hurriedly from the south front of the lawn at 1611 Laird (TR. 24).  Officer Becker testified Fowler walked hurriedly towards the rear of the residence at 1615 Laird along a driveway (TR. 26).  Officer Becker was familiar with Fowler due to numerous personal contacts throughout the years as well as information from confidential informants and police bulletins concerning Fowler's activities involving firearms and narcotics (TR. 26-27).  Officer Sedlacek testified that 1611 Laird was targeted as a congregating hotspot for illegal activity by the Murder Town Gangsters street gang (TR. 102).  It was targeted as a result of neighborhood complaints of drug activity, informant information, and police observation (TR. 102).  Fowler was prominent among the suspected gang members and had the street name, "Head". (TR. 102).

The officers stopped their patrol car and Officer Sedlacek got out of the driver's side of the patrol car while Officer Becker got out of the passenger's side (TR. 27).  When Officer Becker made it to the corner of the house at 1615 Laird he observed Fowler near a trash can at the rear of the house by the driveway (TR. 27). Officer Becker repeatedly called for Fowler to stop and observed Fowler brush against the trash can (TR. 27).  Fowler refused to stop and entered the rear of the house (TR. 27-28).  Through a kitchen window, Officer Becker observed Fowler in the kitchen area at the rear of the house and then observed Fowler move outside to the back of the house onto a deck (TR. 28).  Meanwhile Officer Sedlacek ran toward the rear of 1615 Laird, running parallel to Officer Becker down the east side of the house at 1611 Laird house, the side opposite of Officer Becker (TR. 105).

2

When Officer Sedlacek arrived at the rear of 1611 Laird he observed Fowler on the rear elevated deck of 1615 Laird (TR. 106).   Even though there was a wood fence separating 1611 Laird and 1615 Laird, Officer Sedlacek was able to observe Fowler because of the elevated deck at 1615 Laird (TR. 106).   Officer Sedlacek testified Fowler appeared to be looking in the direction of Officer Becker and he observed Fowler make a sideways throwing motion whereupon Officer Sedlacek heard something hit the wood fence between Officer Sedlacek and Fowler (TR. 106).   Officer Sedlacek was unable to see what the object was but it made an audible thud when it hit the wood fence (TR. 107).   Officer Sedlacek drew his sidearm and pointed it at Fowler giving him directions to stop and get on the ground (TR. 107).   Fowler began to walk off the deck toward Officer Becker and Officer Sedlacek kept loudly ordering Fowler to stop and get on the ground (TR. 107).   Using some curse words, Officer Sedlacek told Fowler to comply or he would shoot (TR. 108).   Officer Becker rounded the rear of 1615 Laird from the other side and had Fowler go to his knees whereupon Fowler was forced to the ground and Officer Becker handcuffed Fowler (TR. 29).   Officer Sedlacek immediately sat on Fowler while directing Officer Becker to look for the object Fowler threw (TR. 109).   Officer Becker retrieved some "crack" cocaine, which was on the ground (TR. 29, 109).   Officer Becker then went to the area of the trash can Fowler earlier brushed up against, looked in the trash can, and recovered a black Glock .40 caliber handgun (TR. 30, 109-110 ).    Following his arrest, Fowler was advised of his *Miranda* rights by Officer Becker at Central Police Headquarters where Fowler acknowledged such rights and spoke with Officer Becker (TR. 31-32; Exhibit 1).

James Walker testified he was from the neighborhood of 16th and Laird and has known Fowler since childhood. Mr. Walker testified he (Walker) has been engaged in gang prevention since his release from prison.  At times he considered himself and Fowler to be gang members (TR. 191).   However, Mr. Walker testified he and Fowler wanted to leave their gang life behind them (TR. 191).   Mr. Walker knows Officer Sedlacek from the past and has had conversations with Officer Sedlacek wherein Officer Sedlacek said he wanted to get Fowler, if Fowler continued to do the things he was doing and assaulting women (TR. 196).  On April 29, 2010, Mr. Walker arrived in the area of 1615 Laird and was parking his car on the street when he observed Fowler backing his car up to park on the street near 1615 Laird (TR. 200).  It appeared Fowler had just completed washing his car (TR. 201).

Mr. Walker was talking with several people near his car and Fowler began to approach them (TR. 201-202). About this time Officers Sedlacek and Becker drove around the corner in the gang unit cruiser (TR. 202). Mr. Walker observed Fowler walk up the driveway at 1615 Laird (TR. 203). Fowler kept walking up the driveway until Mr. Walker's vision of Fowler was blocked by the side of the house at 1615 Laird (TR. 205). Mr. Walker did not believe Fowler accelerated his gait when the gang unit officers arrived but did hear the officers call out to Fowler not to run (TR. 206-207). Mr. Walker observed Officer Becker, with his gun drawn, go up the driveway after Fowler with Officer Sedlacek going up the other side of the house with his gun drawn (TR. 208-211). Mr. Walker observed Fowler walking with his hands up and heard Officer Sedlacek repeatedly tell Fowler to get down or he would shoot him (TR. 213).

Ms. Robinson testified she is Fowler's aunt and has participated in community meetings with Officer Sedlacek wherein Officer Sedlacek has stated he intended to incarcerate Fowler (TR. 228-230). Ms. Allen testified she worked as a certified nurse assistant for her 74 year old godfather who lives at 1615 Laird (TR. 233). Ms. Allen testified she was at 1615 Laird on April 29, 2010, and observed Fowler at that address around 1:30 p.m. when he was washing his car (TR. 233). When he finished with the car, he backed it out and parked it on the street a few houses away (TR. 234-235). Ms. Allen was outside talking with Fowler when she observed the police cruiser drive up and walked with Fowler partway up the driveway when she went inside the house (TR. 235). Ms. Allen heard the officers tell Fowler to stop (TR. 244). Ms. Allen did not observe Fowler increase his gait after the police cruiser arrived (TR. 236). Ms. Allen testified Robert Mays also lived at 1615 Laird and had gang affiliation (TR. 237). Ms. Allen heard the officers yell at Fowler to stop or they would shoot him (TR. 239). When Officer Sedlacek had Fowler on the ground, he had a knee on Fowler's back and said "I told you I was going to get you, Darrow, we finally got you. I finally got you." (TR. 242).

## LEGAL ANALYSIS

Fowler asserts the OPD officers had no basis to detain him on April 29, 2010, and all evidence obtained thereafter and his subsequent arrest and interview should be

suppressed.  The government asserts the officers had a reasonable suspicion that criminal activity was occurring justifying a detention under **_Terry v. Ohio_**_, 392 U.S. 1 (1968)_.

## A. Detention

From the evidence, the court finds the officers had no specific information that a crime was being committed on April 29, 2010.  They observed a group of males, including Fowler, outside of 1611 Laird, a known location for gang activity including drug dealing. While there is a dispute as to whether Fowler ran, walked hurriedly, or simply walked up the driveway at 1615 Laird, that alone did not warrant a detention by the officers in the absence of specific information of criminal activity by Fowler or any of the other males standing outside 1611 Laird.  Fowler's refusal to stop when directed by the officers is not a basis for detention in the absence of an **articulable** suspicion of criminal activity.  The government's citation of **_United States v. Cornelius_**_, 391 F.3d 965 (8th Cir. 2004)_ is misplaced.  In *Cornelius*, the defendant committed a furtive move by placing his hands in his pocket after he observed the police officers and began walking away.  Fowler did nothing more than walk away from the officers in this situation.  The court finds such activity is insufficient to detain a person under the circumstances of this case.

## B. Standing & Abandonment

Assuming, arguendo, the officers did not have a reasonable articulable suspicion to detain Fowler, the firearm seized from the trash can at the side of 1615 Laird and the "crack" cocaine found near the fence at the rear of 1615 Laird are admissible against Fowler.  Fowler did not establish he had any standing in the premises where the items of evidence were seized. To claim Fourth Amendment protection, a defendant must demonstrate that he personally has an expectation of privacy in the place searched, and that his expectation is reasonable. **_Minnesota v. Carter_**_, 525 U.S. 83, 88 (1998)_; **_United States v. Boyster_**_, 436 F.3d 986, 992 (8th Cir. 2006)_.  The reasonableness of the expectation of privacy must have "a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society." **_Rakas v. Illinois_**_, 439 U.S. 128, 143-44 n.12 (1978)_;

**see also** *Smith v. Maryland*, 442 U.S. 735, 740-41 (1979). "If a defendant fails to prove a sufficiently close connection to the relevant places or objects searched he has no standing to claim that they were searched or seized illegally." *United States v. Barragan*, 379 F.3d 524, 529-30 (8th Cir. 2004) (**quoting** *United States v. Gomez*, 16 F.3d 254, 256 (8th Cir. 1994)).

The Eighth Circuit has recognized that:

> The Supreme Court has enunciated a two part test to determine whether a person has a legitimate expectation of privacy in the place searched or the object seized. A court must determine: (1) whether the petitioner has asserted a subjective expectation of privacy, and (2) whether the petitioner's subjective expectation is objectively reasonable.

*United States v. Stallings*, 28 F.3d 58, 60 (8th Cir. 1994) (internal citations omitted). "Fourth Amendment rights are personal rights that may not be asserted vicariously." *Barragan*, 379 F.3d at 529. Therefore, the court "must first determine whether [the defendant] had a legitimate expectation of privacy in the area searched or the item seized." *Gomez*, 16 F.3d at 256. The Eighth Circuit has explained:

> Factors relevant to the determination of standing include: ownership, possession and/or control of the area searched or item seized; historical use of the property or item; ability to regulate access; the totality of the circumstances surrounding the search; the existence or nonexistence of a subjective anticipation of privacy; and the objective reasonableness of the expectation of privacy considering the specific facts of the case.

*Id.*

Fowler has failed to establish he had any Fourth Amendment standing in the premises at 1615 Laird, the trash can at the side of 1615 Laird where the firearm was seized, or the rear of 1615 Laird where the "crack" cocaine was seized from the ground near the fence.

Furthermore, "[a] warrantless search of abandoned property does not violate the Fourth Amendment, as any expectation of privacy in the item searched is forfeited upon its abandonment." *United States v. James*, 353 F.3d 606, 615-16 (8th Cir. 2003); **see** *Abel v. United States*, 362 U.S. 217, 241 (1960). "Whether an abandonment has occurred is determined on the basis of objective facts available to the investigating officers, not on the basis of the owner's subjective intent." *United States v. Tugwell*, 125 F.3d 600, 602 (8th Cir. 1997). To determine whether an item is abandoned, the court evaluates the

circumstances including physical relinquishment of the property.  *James*, 353 F.3d at 616; *United States v. Caballero-Chavez*, 260 F.3d 863, 866-67 (8th Cir. 2001); **see** *United States v. Taylor*, 462 F.3d 1023, 1026 (8th Cir. 2006) (holding property abandoned when thrown away by suspect during pursuit).

Accordingly, either through a lack of standing or by abandonment, Fowler does not have a Fourth Amendment basis to challenge the seizure of the firearm or the "crack" cocaine.

### C.  Probable Cause

Fowler, while initially illegally detained, was properly arrested after the officers had probable cause to arrest him for the firearm and the "crack" cocaine.  Fowler was observed by Officer Becker to brush against the trash can as he was "walking" to the rear of 1615 Laird and Officer Sedlacek heard the "crack" cocaine strike the wooden fence when he was directing Fowler to get on the ground.  These items were later recovered by Officer Becker.

"The Fourth Amendment permits warrantless arrests in public places where an officer has probable cause to believe that a felony has occurred."  *Florida v. White*, 526 U.S. 559, 565 (1999).  "Probable cause exists when, at the time of the arrest, 'the available facts and circumstances are sufficient to warrant a person of reasonable caution to believe that an offense was being or had been committed by the person to be arrested.'"  *United States v. Martinez*, 462 F.3d 903, 908 (8th Cir. 2006) (**quoting** *United States v. Kelly*, 329 F.3d 624, 628 (8th Cir. 2003)).  Therefore, whether probable cause existed for an arrest must be determined at the time of the arrest.   "Probable cause exists if the totality of the circumstances known to all officers involved at the time of the arrest 'were sufficient to warrant a prudent person's belief that the suspect had committed or was committing an offense.'"  *United States v. Mendoza*, 421 F.3d 663, 667 (8th Cir. 2005) (**quoting** *United States v. Cabrera-Reynoso*, 195 F.3d 1029, 1031 (8th Cir. 1999) (citation and internal quotations omitted) and **citing** *United States v. Amaya*, 52 F.3d 172, 174 (8th Cir. 1995) (totality of the circumstances); *United States v. Morgan*, 997 F.2d 433, 435 (8th Cir. 1993) (court may consider collective knowledge)).  The court finds that after finding the gun and "crack" cocaine, the officers had probable cause to arrest Fowler.

### D.  Statement

Having found probable cause to arrest Fowler, the court finds Fowler was properly advised of his *Miranda* rights at OPD Central Police Headquarters and Fowler's statements are admissible against him at trial.

### CONCLUSION

The court finds Fowler's Fourth Amendment rights were not violated and the evidence obtained by the OPD officers on April 29, 2010, should be admissible against Fowler.  The motion to suppress should be denied.

**IT IS RECOMMENDED TO CHIEF JUDGE JOSEPH F. BATAILLON that:**

Darrow Fowler's motion to suppress (Filing No. 16) be denied.

### ADMONITION

Pursuant to NECrimR 59.2 any objection to this Findings and Recommendation shall be filed with the Clerk of the Court within fourteen (14) days after being served with a copy of this Findings and Recommendation.  Failure to timely object may constitute a waiver of any such objection.  The brief in support of any objection shall be filed at the time of filing such objection.  Failure to file a brief in support of any objection may be deemed an abandonment of the objection.

DATED this 10th day of January, 2011.

BY THE COURT:

s/Thomas D. Thalken
United States Magistrate Judge

---

*This opinion may contain hyperlinks to other documents or Web sites.  The U.S. District Court for the District of Nebraska does not endorse, recommend, approve, or guarantee any third parties or the services or products they provide on their Web sites. Likewise, the court has no agreements with any of these third parties or their Web sites. The court accepts no responsibility for the availability or functionality of any hyperlink. Thus, the fact that a hyperlink ceases to work or directs the user to some other site does not affect the opinion of the court.